I'm told everybody is here, so we can proceed straight to the first argument, which is Axon v. Florida's Natural Growers, Inc. Council ready? Thank you. Just give us one second. Okay, Council, you may proceed. Good morning, Your Honors. The issues on appeal in this case are straightforward. The district court erred by failing to apply the correct standard of review on a motion to dismiss, improperly making a number of unfounded factual determinations at the pleading stage. The arguments of the district court are so shaky on many of these grounds that defendants, appellees, do not even bother to vigorously defend all of them, instead attempting new or previously rejected arguments premised entirely on allegations that plaintiff did not even make. I'd like to begin with the issues raised on appeal by plaintiff appellant. Most of these concern simply the failure to apply the correct standard of review. First, the court improperly weighed the evidentiary value of surveys cited by plaintiff in her proposed amended complaint. Is that what the judge did, or did the judge just basically look at the surveys and see whether the surveys supported the representations or the assertions made in the proposed amended complaint? The survey cited found that the majority of consumers understand natural and food labeling to mean no pesticides, no artificial chemicals. That's directly related, that's actually exactly the allegation made by the plaintiff in her complaint. The cases where surveys have previously been rejected were rejected because the survey reaches an entirely different conclusion. For example, in the Manuel v. Pepsi case, this was a survey about the understanding of diet on a soda label, and the conclusion of the survey was people understood that to mean lower calories. The allegation was... The survey here wasn't about this label. It was a 2015 survey about other labels, right? That's correct. It's about consumers' general understanding of the phrase natural on food labeling. What's the problem there? I mean, from your perspective. Why wouldn't that survey get... Where does that survey... Does the survey accomplish your objective, or what? Yes, it does. Explain that, because it's a general survey. It doesn't refer to the glyphosate. Well, it refers to pesticides, and it refers to artificial chemicals. Glyphosate falls under both of those categories. So at the pleading stage, the plaintiff doesn't need to prove her case. She only needs to show that it's plausible that reasonable consumers would understand natural to mean there's no pesticides, there's no artificial chemicals here. Does it matter that the survey goes to the labeling as opposed to the brand name, which is what's particularly an issue here? No, I don't believe that there's anything to base that distinction upon. If there is a distinction, that's a factual issue, and that would be something that would be developed in expert discovery. At that time, the judge and the other side would have the opportunity to scrutinize the expert report, to depose the expert, to look into the methodology. But at this point, we have a survey that shows it's plausible that consumers hold the common-sense belief that natural means nothing unnatural, nothing artificial. And to deprive the plaintiff at this stage of the proceedings is signaling that you cannot bring a case of this kind without first conducting expert discovery. And that seems like an inversion of the proper course of a case in which the plaintiff is allowed several months to gather fact discovery, and then to conduct an expert report that will be scrutinized by the court. Another factual determination that the district court improperly made was the one between the brand name and representations made elsewhere. This is not only unsupported by the case law. What is a factual determination? The court is determining that consumers place more weight on representations elsewhere on the package. That's a factual determination, something that would have to be developed through expert discovery later in the case. This is just an assumption the judge is making, that consumers just always care more about a statement elsewhere on the label and don't read anything into a brand name. This is contradicted by many, many cases in this circuit and throughout the country that have held brand names to be misleading, including brand names that include the word natural, the vino naturals, suave naturals. Some courts, including EDNY. Can the judge here sort of conclude that to the average consumer this wouldn't matter, that there was a trace amount of glyphosate in the product? And if so, is that the right way to look at it? Or should she have looked at it from the perspective of a person who cares about whether there are trace elements in a particular substance? Well, it should be looked at from the perspective of someone who cares that a food is labeled natural. Looks at natural, but then doesn't really, is willing to assume that natural would include some trace element that the FDA never thinks of as a problem. I think it's a real leap to assume that the average consumer walking into the store knows what levels the FDA allows. I might agree with you, but I'm trying to understand what the district court, how the district court thought about this case. I feel the district court simply made an assumption. They're assuming that consumers look at this in a certain way. That's just ultimately a factual question. We would have an expert conduct a survey to analyze that question. Is there a difference between the average consumer and the average person, and the person who, the average of the people who really care about whether there are trace elements of some kind of a pesticide in the product? I mean, there may be consumers who walk into a store, and they really want to be sure, because of some phobia on their part or some feelings that they have, that there are no pesticides in the product. And would that be a valid basis for looking at this? I believe that the survey cited shows that it is plausible that the majority of all consumers understand natural to mean no pesticides, period. And that's really what your case is all about. You're not targeting a particular, not representing, in effect, a particular group that's very sort of has a narrower perspective. That's correct. All right. You've reserved three minutes for rebuttal. Yes. So we'll now hear from the appellees. It's Mr. Kolthoff. Kolthoff. I'm pleased to court. Florida's Natural is the longstanding brand name for 100 percent orange juice made exclusively from a single ingredient, Florida oranges. In order to be 100 percent juice, it is directly expressed from those oranges. It's not concentrated. And it's unadulterated, meaning that it's not diminished in any sort of way. These are trace elements. Judge Ross properly ruled that the plaintiff's claims that it was not natural or that consumers were misled was just not plausible. Context and common sense are crucial. And that's in the Fink case, which is in the Second Circuit, and that's also in, well, normally a line of cases. Plaintiff's allegations are conclusory and conjectural and do not establish that the reasonable consumer would be objectively misled by a trace amount of glyphosate in the juice that the EPA has considered safe and the FDA considers unadulterated. How do we know that without evidence? Because, one, if you look in the complaint, Your Honor, they're saying it's been around as a weed killer since 1974, and that the average consumer is well aware of these trace amounts in just about every- Where's the evidence? Excuse me? Where's the evidence of that? Well, if you take a look in common sense, Your Honor, that if you look at, like, for example, if you look- But you and I think. Right. It's what people- Is that what would be the standard here? I think here it would be safe, because if you look at the context, Your Honor, the tolerance is established by the EPA has taken into account the extent to which the use of such substance is required or cannot be avoided in the production of this particular fruit. And it's the same- But how does that translate to what a reasonable consumer knows? Because- As background information. I understand. And if you look at this complaint, the paragraph 17, for example, of the proposed amending complaint, the plaintiff is alleging that she wants a similar result as if squeezed from the oranges themselves. That's patently unreasonable. The oranges that you get from Florida natural growers, not from concentrated oranges, are the same oranges as if you went into the produce section of the store that consumers have been going to for decades, or if you went to a farm stand in Florida. If you squeezed those oranges, you would still get a trace amount of glyphosate. This is something that people understand. The same way, if you come out- They understand it notwithstanding the label that says something different. That's my problem. I'm not asking- All she's asking for is a proper label, I think. Okay. Well, she has correctly pointed out that this is the brand name. In this particular context, Florida's natural, it's unlike the plaintiff's claims where they're talking about Suave's natural, where a producer has put into a product an ingredient that is not natural. This is way back in the growing process, and then it's impossible to make oranges. The label does not say 100 percent natural. Could it, under your theory that it's common sense that there's trace elements of the chemical, why couldn't you say it's 100 percent? I believe it could, and if you bear with me for a second, if you look at 21 CFR Section 1030, it goes into what an orange juice is. A juice that is unadulterated, expressed directly from the fruit, and not from concentrated, shall be called 100 percent juice. It goes on in that same section, subsection, I think it's Section L, that a beverage is required to have that percentage juice declaration on the label. And then in that same subsection L, it says if you're not 100 percent juice, you can't use a term to describe the juice content, and it specifically says 100 percent natural or 100 percent pure. So in other words, the FDA is taking the position that these are synonyms for 100 percent juice declaration. So they're saying you can't, if you're not 100 percent juice, you can't call it 100 percent natural or 100 percent pure. It is with all respect to Judge Ross, if you wouldn't have this regulation, you wouldn't have this sentiment in context, if 100 percent juice couldn't be called 100 percent natural or 100 percent pure, because you wouldn't have to warn producers who aren't 100 percent juice that you can't call it, you can't describe it as 100 percent pure or 100 percent natural. There's a whole regulatory scheme to this, where trace elements, trace elements are in every food product throughout the country for decades. It makes it possible for people in New York to drink juice grown in Florida. It makes it possible for people in Florida to get grapefruit grown in California. It makes it possible for people in the Midwest or big cities to have. Look, all this is great, but did Ross rely on these arguments? I think she relied on common sense, that it's been there for a long period of time. She said that the label that just says Florida's natural, and then it says 100 percent juice. It's in the refrigerated section. It does not say 100 percent natural. It doesn't say 100 percent pure. It does not represent that there are no pesticides used in the production process. And it doesn't say that if you can't. It doesn't say any representation of what is used to grow the juice, other than they're Florida oranges, and. You can pass the survey. Okay, the survey, you want me to? You can pass the survey. If the natural label means to 63 percent of those surveyed that no toxic pesticides were used, then why isn't that enough to get past the motion to dismiss? Because Judge Ross ruled that the generic survey that's there couldn't support the broad allegations of the proposed amended complaint. That may be fine. That's her ruling, but we're here. Okay, but she read it. Yeah. Oh, well, it doesn't. The survey didn't address orange juice.  It simply states a majority of consumers. It does not disclose how toxic. Whether it makes the complaint plausible. Well, I know that we should be sensitive in a plausibility standard because we should. But this case is so, is what I would call an absurdity in the law. Because as pointed out by the court who was in the Quaker Oats case, which is cited in our briefs, it's impossible to produce without these trace amounts. It's considered safe. The juice itself is considered unadulterated, which means that it's not there. It doesn't count as an ingredient added. Most of the cases that you see that cite. I might agree with you as an individual consumer of orange juice. But that's not the test. I mean, the test is whether there would be sufficient evidence based upon the, if there were discovery, indicate to the contrary. In terms of people's belief when they buy that, buy juice under that label of natural. But in this case, if she has the belief that this juice would be similar as fresh squeezed itself, and that's what she says in the complaint, and I want to hold the plaintiff to the complaint and the proposed amended complaint because she's had two bites of the apple to phrase it. If she's saying this is, she believes it's similar to as if squeezed herself, that is patently unreasonable. Well, it's not supported by the servant. It's not supported by the survey. According to the complaint is that 63% of consumers think that the natural label on packaged or processed foods currently means that no toxic pesticides were used. And Judge Ross found that that was vague as to what it meant were used. And that it didn't support the allegations in the complaint. Right. And the survey did not, the survey didn't address orange juice. It didn't address this particular label. And it didn't address reality. The EPA and the FDA have looked at this. It looked at the production of orange juice or milk and said there's going to be trace elements. And this is one one-hundredth of the amount allowed. After EPA made these considerations, the FDA made the considerations, they're saying it's statistically insignificant. It doesn't exist. Even after this appeal was filed, the EPA came out, which we filed with the court. The EPA came that the glyphosate is safe. The product is still considered unadulterated. All we're saying is we've had a brand name that hasn't, that's been longstanding. Hasn't for years. We call it 100% juice. We've had prior courts say that this is. Organic would have a different meaning, right? Excuse me? Organic would have a different. Oh, yes. And that was what the court pointed out in the Quaker Oats case. That even organic has, allows for a trace amount of pesticide at a lower rate. And actually this rate would be, what's alleged in this complaint would be even lower than that. But organic is not used on this label, is it? No, it's not. But organic is considered a higher order and it would be more expensive. And as the court said in In Re General Mills glyphosate litigation, it said that in that case they were saying made with 100% natural whole grain oats means it could be interpreted by a reasonable consumer. It means that there is no trace glyphosate in Nature Valley products. It would be implausible that a reasonable consumer would believe that a product labeled as having one ingredient, in this case oats, that 100% natural could not contain a trace amount of glyphosate. That is far below the amount permitted for organic products. And here we are. We have an amount that is extremely low, statistically insignificant. It's the realities of production. If the court ruled that this could go forward, it basically says that any fruit or juice that's currently sold in the grocery store cannot be called natural because you just can't eliminate it. It would be... I mean, it's natural juice, but the entire substance is not natural. I mean, you know, in that sense. I mean, you know, a little asterisk somewhere saying trace amounts that the FDA has considered to be totally insignificant of pesticides that are used in the growing process may exist. You said two things, Your Honor, that's important. One, you said it's natural juice. And that's all we said as far as natural, which is the brand name. The second thing is that under the EPA, under the Doctrine of Preemption in the EPA regulations, it's already admitted that the EPA and the FDA do not require the disclosure of the trace amounts. And if you had a complaint that sought the disclosure of the trace amounts or sought the elimination of the trace amounts, that would be contrary to the EPA regulations. And, in fact, this complaint in its request for injunctive relief asked for the product to be changed to conform with the label. And that in and of itself would be preempted. And they've... Roberts. You're talking about one case, the oats case? Carvin. Yes.  That's the main case that you're relying on, isn't it? Carvin. That's the main case. You also have podocaspor, which is admittedly a Dan and yogurt case in the one of the local district courts here we cite, which is milk that was advertised as 100% natural or yogurt that was advertised as 100% natural. And the plaintiff complained, well, the cows are eating genetically modified feed. And the court said, well, you know, this is way back in the chain of production. So, therefore, it's not misleading to call that product 100% natural or 100% pure. In this case, it's a fact of life that, you know, lysophate has been used as a weed killer. There's no allegation in the complaint that we're putting it in as an ingredient. There's no allegation in the complaint that it's anything else than a weed killer that's put on the ground. It's been around since 1974. It's a fact of life. I think you're over. We're going to hear now from Mr. Binkley with respect to his rebuttal. Okay.  Thank you. I'd like to respond just briefly to the argument regarding preemption that was just mentioned. This argument has been denied, and I've lost count of the number of cases along these lines, but it was denied in this one as well. This is simply not a case about the safety of the product. It's not about the safety of specific levels of a chemical. It's not about the requirement to disclose a chemical. That's clear from the complaint. The complaint is about whether the word natural, which is unregulated by the federal government, and which defendants chose to use, whether that is being used properly. That's it. This is not about safety, and it's not about disclosure. What about the common-sense view that consumers really could care less about whether there is a ridiculously small amount of glyphosate in the juice? That's way below the FDA standards. Therefore, it doesn't matter. Natural can be used under those circumstances. It's an unwarranted assumption that consumers know what the FDA level is for a given chemical, and that that's how they base their understanding of the word natural. I believe it's more common sense that they simply think natural means nothing unnatural, no artificial chemicals. Do you think they'd be shocked to learn that there are pesticides used in orange groves, and that trace amounts get into, that it's totally safe to get into the product? That get into a product labeled natural? Yes. That's why people buy products labeled natural, is they think that this product was made in a different way. Yeah, there could be additives. There could be flavors and colorings and so forth that could be added. That's why, I don't know. I mean, I don't know how, you know, at what stage this case gets dismissed, but because it doesn't seem to me that the surveys, when they focus, or the evidence, when they focus, is going to get you all that far, but you might, maybe you get past the motion to dismiss. I don't know. I do believe that the evidence would show that consumers don't place a distinction between artificial chemicals that get in as part of the growing process, and artificial chemicals that are an additive. There's no reason to assume that consumers are more troubled by an artificial additive than by an artificial pesticide. In fact, pesticides are one of the main things consumers seek to avoid when purchasing natural products. What about the yogurt case, which I can't really pronounce, Podpiskar, that your friend just mentioned? Yes. How does that factor in here? It's not precedential, obviously, but it's another case involving, you know, chemicals used in the early stages of production. This was far more attenuated. This was a case in which the cows ultimately producing the product consumers buy were fed GMO feed. It wasn't in the product that consumers were actually buying. Here, consumers are buying a product that says natural, and in that product is something not natural. That's a very different case than something that simply doesn't contain the substance that consumers are worried about. There was no claim that in the milk produced by the cows that there was this product? I don't believe so. Just in terms of limiting principles, on the theory that you're putting forward, any product with natural in the title, whether it modifies something or not, on the basis of the consumer study that you seek to introduce for the amendment purposes, any such claim could get past the motion to dismiss stage, right? If there is a detectable level of an artificial chemical, a pesticide, then yes. Well, the yogurt case was focused on the fact that there were no ingredients that were added that were chemicals or that were unnatural, right? That was the language that was used by the court. It was, but I... The same is true here, right? There's no ingredients, and the appellees are not adding chemicals as part of the process of cartoning juice, right? You're not alleging that? There's nothing in the complaint that says that? No. Okay. Okay. Nothing else? All right, thank you. We'll reserve.